# UNITED STATES DISTRICT COURT
## FOR THE EASTERNDISTRICT OF TENNESSEE
## NORTHERN DIVISION

DEBBIE SAILE, Individually and on Behalf of All Others Similarly Situated,

                    Plaintiff,

      v.

RUBY TUESDAY, INC., JAMES F. HYATT, II, STEPHEN I. SADOVE MARK W. ADDICKS, F. LANE CARDWELL, JR., KEVIN T. CLAYTON, DONALD E. HESS, BERNARD LANIGAN, JR. and JEFFREY J. O'NEILL,

                    Defendants.

Case No. _____

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Debbie Saile ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiff on behalf of herself and the other ordinary shareholders of Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company"), except Defendants (defined below) and their affiliates, against Ruby Tuesday and the members Ruby Tuesday's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C.

§§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between Ruby Tuesday and NRD Capital ("NRD").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading proxy statement (the "Proxy Statement") to be filed with the SEC and disseminated to Ruby Tuesday shareholders. The Proxy Statementrecommends that Ruby Tuesday shareholders vote in favor of a merger whereby NRD, by way of a merger with RTI Holding Company, LLC ("Holding") and its wholly-owned subsidiary, RTI Merger Sub, LLC ("Merger Sub"),[1] in an all-cash transaction, will acquire Ruby Tuesday, with Ruby Tuesday surviving as a wholly owned subsidiary of Holding (the "Proposed Transaction"). Pursuant to the terms of the agreement and plan of merger the companies entered into (the "Merger Agreement"), Holding will acquire all issued and outstanding shares of Ruby Tuesdaycommon stock in a going private transaction.  Ruby Tuesday common stockholders will receive $2.40 in cash in exchange for each share of Ruby Tuesday common stock they hold prior to the effective time of the merger (the "Merger Consideration").

3.     Pursuant to the terms of the Merger Agreement, NRD will acquire Ruby Tuesday in a transaction valued at approximately $146.3 million to shareholders.  NRD will also assume or retire all debt obligations for a total enterprise value of approximately $335 million.

4.     As discussed below, the Merger Consideration appears inadequate, and the process by which Defendants consummated the Proposed Transaction is fundamentally unfair to Plaintiff and the other common shareholders of Ruby Tuesday.  Defendants have now asked Ruby Tuesday's shareholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act.

---

[1]Both Holding and Merger Sub are affiliates of NRD Partners II, L.P.

{005265/17502/00435919.DOCX / Ver.1}

5. Specifically, the Proxy Statementcontains materially incomplete and misleading information concerning: (i) the terms and details surrounding any alternative indications of interest the Company solicited or received from other companies; (ii) the financial projections for both Ruby Tuesday; (iii) the financial analyses performed by the Company's financial advisor, UBS Securities LLC ("UBS"), in support of its fairness opinion; and (iv) the actual Merger Consideration.

6. The special meeting of Ruby Tuesday shareholders to vote on the Proposed Transaction is approaching. It is imperative that the material information omitted from the Proxy Statements disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

7. For these reasons as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Ruby Tuesday's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Ruby Tuesday maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff Debbie Saile is, and has been at all relevant times, the owner of Ruby Tuesday common stock and has held such stock since prior to the wrongs complained of herein. A copy of Plaintiff's certificate attesting to her ownership of stock during the relevant period is attached hereto as Exhibit A.

12.     Defendant Ruby Tuesday is a Georgia corporation with its principle executive offices located at 333 East Broadway Avenue, Maryville, Tennessee 37804.  Ruby Tuesday owns, operates, and franchises the Ruby Tuesday casual dining restaurant chain and operates in the bar and grill segment of the casual dining industry.  As of September 5, 2017, there were 599 Ruby Tuesday restaurants in 41 states and 14 foreign countries.  Ruby Tuesday's common stock trades on the NYSE under the symbol "RT."

13.     Individual Defendant James F. Hyatt, II ("Hyatt") is President and Chief Executive Officer of the Company, and has been a director of the Company since April 2017.

14.     Individual Defendant Stephen I. Sadove ("Sadove") is non-executive Chairman of the Board of the Company, and has been a director of the Company since 2002.

15.     Individual Defendant F. Lane Cardwell, Jr. ("Cardwell") has been a director of the Company since 2012.  Cardwell served as interim President and Chief Executive Officer of the Company from September 2016 to April 2017.

16.     Individual Defendant Bernard Lanigan, Jr. ("Lanigan") has been a director of the Company since 2001.

17.     Individual Defendant Mark W. Addicks ("Addicks") has been a director of the Company since 2014.

18.     Individual Defendant Donald E. Hess ("Hess") has been a director of the Company since 2014.

19.     Individual Defendant Kevin T. Clayton ("Clayton") has been a director of the Company since 2006.

20.     Individual Defendant Jeffrey J. O'Neill ("O'Neill") has been a director of the Company since 2012.

21.     The defendants identified in paragraphs 11 through 20 are collectively referred to as the "Defendants" or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Ruby Tuesday common stock who are being and will be harmed by Defendants' actions described below (the

{005265/17502/00435919.DOCX / Ver.1}

"Class").    Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

23.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable. According to Ruby Tuesday's most recent quarterly report on Form 10-Q, as of October 9, 2017, there were approximately 61,186,581 shares of Ruby Tuesday common stock outstanding.

(b)    The holders of these shares are believed to be geographically dispersed through the United States;

(c)    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

i.    whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

ii.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii.    whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Merger as presently anticipated.

(d)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(e)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(f)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(g)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Background

24.     The Company owns and franchises Ruby Tuesday brand restaurants.  As of September 5, 2017, there were 599 Ruby Tuesday restaurants in 41 states, 14 foreign countries, and Guam.  Ruby Tuesday operates in the bar and grill segment of the casual dining industry, which is intensely competitive with respect to prices, services, convenience, locations, employees, advertising and promotion, and the types and quality of food.

25.     After several years of struggling financial results, Ruby Tuesday commenced an aggressive restructuring and cost-savings initiative in late 2016.  On August 11, 2016, the Company announced that it would closing approximately 95 of its underperforming locations in an effort to streamline the organization, improve financial profitability, and create long-term value for shareholders through its Fresh Start initiative.

26.    On September 13, 2016, James J. Buettgen, Ruby Tuesday's President and CEO at the time, resigned, and the Board appointed Cardwell to serve as the interim President and CEO until a successor was found.

27.    On September 23, 2016, NRD sent the Board an unsolicited letter of intent, which outlined NRD's interest in acquiring Ruby Tuesday at $3.50 per share.  After consulting with UBS and management, the Board determined that NRD's proposal was not in the best interests of the Company.

28.    On January 11, 2017, NRD sent a follow-up letter to Ruby Tuesday reiterating its offer of $3.50 per share.  Also on January 11, 2017, Ruby Tuesday retained UBS as its financial advisors.

29.    On January 18, 2017, UBS spoke with NRD and explain that the Ruby Tuesday would be allowing NRD to conduct limited due diligence on the Company for a 30-day period, without providing for exclusivity, and with the understanding that NRD would be *improving* its offer price.

30.    On February 27, 2017, NRD submitted revised, albeit *reduced*, offer price range of $2.50 to $3.00 per Ruby Tuesday share.

31.    Over the next month, NRD and Ruby Tuesday engaged in negotiations, which ultimately resulted on in the Board issuing a press release on March 13, 2017, announcing that the Company was considering "strategic alternatives in order to maximize shareholder value and position the business for long-term success."

32.    At the direction of the Board, UBS conducted preliminary negotiations with 47 parties, which Ruby Tuesday entered into confidentiality agreements with 23 of those parties.

33.    Beginning in late March 2017, at the direction of the Board, UBS sent letters to 19 parties, requesting initial, non-binding proposals for a strategic transaction with the Company.

34.    On April 6, 2017, Ruby Tuesday named Hyatt as President and CEO of Ruby Tuesday and a member of the Board.

35.    On April 13 and April 14, 2017, the Company received preliminary, non-binding indications of interests from 9 parties.  Five parties (referred to here as Bidders 1 through 5) submitted proposals to acquire the entire company for consideration per share of $2.40 to $2.60 (Bidder 1), $3.05 (Bidder 2), $3.25 to $3.40 (Bidder 3), $5.75 (Bidder 4) and $2.25 to $2.75 (Bidder 5).   At the time, NRD offered to purchase Ruby Tuesday at the purchase price of $2.51 per share.

36.    On April 24, 2017, Bidder 4 submitted a revised proposal to acquire Ruby Tuesday at $2.75 to $3.25 per share.

37.    On May 18, 2017, the Board communicated to the 6 remaining interested parties that second round, non-binding proposal should be submitted to the Company by June 12, 2017.

38.    During this interim, Ruby Tuesday entered into a revolving credit agreement (the "Revolving Credit Agreement") with UBS acting as the lender on May 26, 2017.

39.    The Revolving Credit Agreement required that Ruby Tuesday perform an independent review of its assets, which placed a value on its properties on an "as-dark basis" – meaning the appraised value assumed no business operations.  Total value was estimated at $360 million, and this appraisal assumed no net value to the Ruby Tuesday brand, nor the Company's long-term ground leases, which in many locations appear to be below-market rates.

40.    On August 21, 2017, Ruby Tuesday released its financial results for the fourth quarter of fiscal 2017.  Hyatt stated, in part:

While the casual dining environment remains challenging and highly competitive, we are pleased to have achieved a sequential improvement in same-restaurant sales and operating performance for the fourth quarter as we had expected. Our same-restaurant sales trend improved 240 basis points from a 4.0% decline in the third quarter to a 1.6% decline in the fourth quarter while we held our performance gap relative to the industry constant. Additionally, we reported adjusted net income for the fourth quarter following three quarters of adjusted net losses, as we have stemmed the decline in our top-line while controlling expenses. Looking ahead to fiscal 2018, we expect to achieve year-over-year improvement in restaurant level margins and EBITDA as we execute our new 'Plan to Win' strategy.

Based on learnings from the field and feedback from team members and guests, we have developed our "Plan to Win" road-map for the next 12 months. Our top three priorities are to improve the total guest experience, ignite same-restaurant sales growth, and deliver system profitability. We have developed a comprehensive strategy to realize these goals over the stated time frame and believe this game plan will position Ruby Tuesday towards achieving sustained profitable growth and increasing shareholder value.[2]

41.      On June 8, 2017, NRD submitted its revised proposal at an increased purchase price of $2.77 per share.  In addition, the revised proposal also requested Ruby Tuesday enter into an exclusivity agreement by 5 PM on June 10, 2017.  In response, the Board decided that it would not enter into the exclusivity agreement and that it would not engage with NRD until after the June 12, 2017 deadline.

42.      On June 12, 2017, Bidder 7 and Bidder 8 submitted a joint, non-binding proposal to acquire the Company at $320 million.  Bidder 2 submitted a proposal to acquire the Company at $3.05 per share.  Bidder 11 submitted a proposal which contemplated an aggregate merger consideration of $375 million.  However, on June 14, 2017, Bidder 11 revised it proposal to instead acquire the whole Company for $2.883 per share, and on June 19, 2017, Bidder 11 revised its proposal again, but instead to an increased offer price of $3.50 per share.

---

[2] *Ruby Tuesday's (RT) CEO Jim Hyatt on Q4 2017 Results – Earnings Call Transcript*, Ruby Tuesday (August 21, 2017), https://seekingalpha.com/article/4100830-ruby-tuesdays-rt-ceo-jim-hyatt-q4-2017-results-earnings-call-transcript.

43.     Shortly thereafter, Ruby Tuesday informed the remaining bidders—NRD, Bidder 2, and Bidder 11—that July 12, 2017 would be the deadline for final proposals.  When July 12 arrived, NRD proposed acquiring the Company at $2.55 share, while Bidder 11 proposed $3.50 per share.[3] However, on July 25, 2017, Bidder 11 reduced its offer price to $2.88 per share.

44.     On August 12, 2017, NRD requested that Ruby Tuesday and NRD execute a no-shop agreement by the end of August 13, 2017, or NRD would terminate discussions with the Company.  Later the next day, the Board discussed the most recent proposals from the interested parties and executed a 30-day (*i.e.*, until September 13, 2017), no-shop agreement with NRD, thereby ceasing discussions with Bidder 8 and Bidder 11.  Notably, during the negotiations regarding the no-shop agreement, NRD assured UBS that it would ***not lower its offer below $2.55 per share in the future***.

45.     On September 13, 2017, the 30-day no shop agreement expired.  However, the Company did not resume, or even attempt to resume, discussions with Bidder 2 and Bidder 11.

46.     On September 26, 2017, Ruby Tuesday communicated NRG and explained that discussions would not continue between the parties past October 12, 2017 without a fully-financed executable merger agreement.

47.     Although Ruby Tuesday essentially limited itself to reaching an agreement with NRG, on October 9, 2017, Bidder 11 expressed its interest in acquiring Ruby Tuesday for an offer price of ***$2.88 per share***.  In contrast, 2 days later, NRG ***reduced its offer to $2.40 per share*** from $2.55.

---

[3] Bidder 2's final offer proposed acquiring 62 fee simple sites owned by Ruby Tuesday for $46.5 million in cash.

48.     Without making any effort to communicate with Bidder 11 and discuss its potentially superior offer, Ruby Tuesday entered into the Merger Agreement with NRG on October 16, 2017.

49.     Also October 16, 2017, Ruby Tuesday announced the Proposed Transaction and released its financial results for the first quarter of fiscal 2017.  The Company announced that adjusted EBITDA was $13.3 million compared to $4.9 million in the first quarter of the prior fiscal year and that Adjusted Net Loss was $0.7 million, or ($0.01) per diluted share, compared to an Adjusted Net Loss of $6.8 million, or ($0.11) per diluted share in the first quarter of the prior fiscal year.

50.     The Proposed Transaction comes at a time when Ruby Tuesday's recent and future success has not been fully reflected by its share price. The Proposed Transaction will inappropriately cap the growth Ruby Tuesday shareholders are likely see in their investment. Indeed, NRD was founded with the express intention of working with franchisor/franchisee restaurant assets, and sees Ruby Tuesday as a differentiated player in casual dining.  It is very likely that NRD will continue the Company's revitalization—its last two quarters have seen significant increases compared to earlier quarters—with expectations to turn around the Ruby Tuesday brand, and eventually engage in sale-leaseback transactions with franchisee investors to monetize the assets it has acquired.

51.     Despite Ruby Tuesday's improving financial results in its two recent quarters and the possibility of a further turnaround in its brand, Defendants have agreed to sell the Company now and deprive its shareholders of the ability to partake in the Company's future growth. Defendants breached their fiduciary duties owed to the Company's remaining shareholders by agreeing to the Proposed Transaction for the inadequate Merger Consideration.

**B.**     <u>**The Proposed Transaction**</u>

      52.     On October 16, 2017, Ruby Tuesday announced the Proposed Transaction in a

press release, which states in relevant part:

> **Ruby Tuesday To Be Acquired By NRD Capital For $2.40 Per Share**
>
> **Maryville, TN – October 16, 2017** – Ruby Tuesday, Inc. (NYSE: RT) today announced an agreement to be acquired by a fund managed by NRD Capital ("NRD"), an Atlanta-based private equity firm that specializes in franchised and multi-location business investments.
>
> Under the terms of the agreement, NRD will acquire all of Ruby Tuesday's common stock for $2.40 per share in cash and will assume or retire all debt obligations for a total enterprise value of approximately $335 million, excluding transaction expense. The purchase price represents a premium of approximately 37% over Ruby Tuesday's closing share price on March 13, 2017, the day before the Company announced its intention to explore strategic alternatives, and a premium of approximately 21% over Ruby Tuesday's closing share price on October 13, 2017.
>
> "The Board of Directors and our advisors have thoroughly evaluated all options available to the Company and are confident that this agreement will provide the most promising opportunity to realize the highest value for our stockholders while providing the best path forward for the Ruby Tuesday brand, its employees, franchisees, and loyal customers," said Stephen Sadove, Non-executive Chairman of Ruby Tuesday. "NRD Capital has a distinguished track record of achieving and maintaining profitable growth for restaurant concepts and will be an excellent partner to lead Ruby Tuesday going forward."
>
> The transaction has been unanimously approved by Ruby Tuesday's Board of Directors and NRD and is subject to shareholder approval and other customary closing conditions. The acquisition is expected to be completed during the first calendar quarter of 2018. UBS Investment Bank is serving as financial advisor to Ruby Tuesday and provided a fairness opinion to the Ruby Tuesday Board of Directors.
>
> "Our focus at NRD is investing in quality restaurant companies and providing strategic and operational expertise to create sustainable value. With a well-established brand, differentiated from other casual dining restaurants by its Garden Bar, we see significant opportunities to drive value for Ruby Tuesday," said Aziz Hashim, founder of NRD. "We are excited to be part of the Company's next chapter. As a private company, we will be able to take a long-term view on Ruby Tuesday, allowing us to

make an investments in people, product, and customer experience, without public company constraints. This approach will enable us to reward everyone involved in our success, in addition to our investors."

Davis Polk is serving as legal advisor to Ruby Tuesday. Cheng Cohen is serving as legal advisor to NRD and Arlington Capital Advisors is serving as financial advisor to NRD.

**About Ruby Tuesday, Inc.**

Ruby Tuesday, Inc. owns and franchises Ruby Tuesday brand restaurants. As of September 5, 2017, there were 599 Ruby Tuesday restaurants in 41 states, 14 foreign countries, and Guam. Of those restaurants, we owned and operated 541 Ruby Tuesday restaurants and franchised 58 Ruby Tuesday restaurants, comprised of 17 domestic and 41 international restaurants. Our Company-owned and operated restaurants are concentrated primarily in the Southeast, Northeast, Mid-Atlantic, and Midwest of the United States, which we consider to be our core markets. For more information about Ruby Tuesday, please visit www.rubytuesday.com. Ruby Tuesday, Inc. is traded on the New York Stock Exchange (Symbol: RT).

**About NRD Capital**

NRD Capital invests in brands that offer superior products or services and compelling unit-level economics in order to help them strategically grow through the power of franchising. The fund was founded in 2014 by Aziz Hashim, one of the world's leading experts on franchising, with the goal of leveraging operational and financial experience to position high quality brands for accelerated but responsible growth. The differentiated private equity fund takes a unique approach to investing, applying operating expertise and leveraging its wide network of franchisees, in addition to infusing capital in its portfolio companies.[4]

53. Rather than continuing to build upon Ruby Tuesday's improving prospects since 2016, and the inherent value of its real estate portfolio, the Merger Consideration being offered to Ruby Tuesday's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Ruby Tuesday common stock is

---

[4]Ruby Tuesday, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Press Release, dated October 16, 2017) (October 16, 2017).

materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

**C.**    <u>**The Preclusive Deal Protection Devices**</u>

54.    To the detriment of Ruby Tuesday shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

55.    First, Section 6.03 of the Merger Agreement imposes a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

56.    In addition, the Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

57.    Second, Section 6.03(c) of the Merger Agreement requires the Board to provide NRD with written notice of any Acquisition Proposal within two (2) business days of its receipt. Further, the Board must provide prior written notice within two (2) business days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with NRD following NRD's receipt of the notice, so that NRD has the opportunity within five (5) business day to adjust the terms and conditions of the Merger Agreement so that the Company Acquisition Proposal ceases to be a Superior Proposal.

58.     Finally, the Merger Agreement provides that Ruby Tuesday must pay NRD a termination fee of $7.5 million, representing *5.1% of the approximate deal value* to shareholders of $146.3 million, if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay an unreasonable premium for the right to provide the Company's shareholders with a superior offer.   A termination fee in the amount 5.1% is unreasonably high for this type of transaction and strongly discourages any other bidder from coming forward.

59.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

### D.     The Proxy Statement Is Materially Incomplete and Misleading

60.     On October 31, 2017, Ruby Tuesday filed the preliminary Proxy Statementwith the SEC in connection with the Proposed Transaction.   The Proxy Statement solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

***Financial Projections Prepared by Ruby Tuesday's Management***

61. The Proxy Statement provides several non-GAAP financial metrics, including Restaurant Level EBITDA and Adjusted EBITDA, for Ruby Tuesday, but fails to provide the line item projections detailed below for the metrics used to calculate these non-GAAP measures.

62. First, the Proxy Statement fails to provide any definition for Restaurant Level EBITDA. Accordingly, Ruby Tuesday shareholders are unable to assess what various deductions and/or adjustments Ruby Tuesday management considered when developing this non-GAAP financial metric.

63. Second, the Proxy Statement defines Adjusted EBITDA as "Restaurant Level EBITDA *plus* Franchisee Revenue *minus* Marketing *minus* General and Administrative." However, as mentioned above, the Proxy Statement fails to define what *is* Restaurant Level EBITDA.

64. Failure to provide complete and full disclosure of the line item projections for the metrics used (e.g., Restaurant Level EBITDA) to calculate the above-mentioned non-GAAP metrics leaves Ruby Tuesday shareholders without the necessary, material information to reach a full-informed decision concerning the Company, the fairness of the Merger Consideration, and, ultimately, whether to vote in favor of the Proposed Transaction.

65. Furthermore, Ruby Tuesday has previously provided its shareholders with the above-mentioned information, and the disclosure of such information has illustrated that there is a substantial difference between the GAAP and non-GAAP financial metrics. For example, the chart below is from Ruby Tuesday's first quarter 2018 press release:

**Non-GAAP Reconciliation Table**
**Reconciliation of EBITDA, Adjusted EBITDA, Adjusted Net Loss, and Adjusted Net Loss Per Share**
**(Amounts in thousands except per share amounts)**
**(Unaudited)**

| | 13 Weeks Ended September 5, 2017 | | 13 Weeks Ended August 30, 2016 | |
|---|---|---|---|---|
| **Net Loss** | $ (9,846 | ) | $ (39,692 | ) |
| Depreciation and Amortization | 9,429 | | 11,229 | |
| Interest Expense, Net | 5,072 | | 4,877 | |
| Expense / (Benefit) for Income Taxes | 51 | | (1,694 | ) |
| **EBITDA** | $ 4,706 | | $ (25,280 | ) |
| Closures and Impairments, Net [1] | 7,819 | | 30,192 | |
| Costs Related to Review of Strategic Alternatives [2] | 819 | | - | |
| **Adjusted EBITDA** | $ 13,344 | | $ 4,912 | |
| **Net Loss** | $ (9,846 | ) | $ (39,692 | ) |
| Closures and Impairments, Net [1] | 7,819 | | 30,192 | |
| Costs Related to Review of Strategic Alternatives [2] | 819 | | - | |
| Income Tax Benefit from Adjustments [3] | (3,428 | ) | (11,983 | ) |
| Income Tax Expense / (Benefit) Adjusted to Statutory Rate [4] | 3,939 | | 14,732 | |
| **Adjusted Net Loss** | $ (697 | ) | $ (6,751 | ) |
| **Net Loss Per Share** | $ (0.16 | ) | $ (0.66 | ) |
| **Adjusted Net Loss Per Share** | $ (0.01 | ) | $ (0.11 | ) |
| **Basic Shares Outstanding [5]** | 60,411 | | 59,790 | |
| **Diluted Shares Outstanding [5]** | 60,411 | | 59,790 | |

(1) Includes property impairments, closed restaurant lease reserves, other closing expenses, and losses / (gains) on sales of properties.
(2) Includes costs associated with exploring strategic alternatives in order to maximize shareholder value and position the business for long-term success.
(3) Represents the tax impact of the adjustments to Net Loss at the Company's statutory tax rate (39.69%).
(4) Represents the Company's Income Tax Benefit adjusted to the Company's statutory tax rate.
(5) Net Loss and Adjusted Net Loss per share figures are calculated based on diluted shares outstanding.

66.      The omission of the above-referenced projections renders the financial projections included on pages 53 through 54 of the Proxy Statement materially incomplete and misleading. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft

information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

67.     Furthermore, complete disclosure of the above-mentioned information omitted from the financial projections is particularly important for Ruby Tuesday shareholders in light of the fact that the Ruby Tuesday shareholders are being asked to vote in favor of Proposed Transaction and, if the Proposed Transaction is consummated, shareholders will be unable to partake in the Company's future growth

**UBS's Valuation Analyses and Fairness Opinion**

68.     With respect to UBS's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose the following key components used in their analysis: (i) Ruby Tuesday's terminal value; (ii) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 1.5% to 2.5% used for Ruby Tuesday; and (iii) the inputs and assumptions underlying the calculation of the discount rate range of 9.5% to10.5% used for Ruby Tuesday. *See* Proxy Statement51.

69.     These key inputs are material to Ruby Tuesday shareholders, and their omission renders the summary of UBS's *Discounted Cash Flow Analyses* materially incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **_unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices_**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

70. With respect to UBS's *Selected Transactions Analysis* and *Selected Public Companies Analysis*, the Proxy Statement fails to disclose the individual multiples UBS calculated for each company and transaction utilized. The omission of these multiples renders the summary of these analyses and the implied equity value reference ranges materially misleading. A fair summary of Selected Transactions Analysis and Selected Public Companies Analysis requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as Ruby Tuesday shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

71. Furthermore, with valuation analyses conducted by UBS in its fairness opinion indicate that the value of Ruby Tuesday's stock has substantially greater value than represented by the Merger Consideration. For example, UBS's *Selected Transactions Analysis* indicates a per share value range of $3.12 for the Company, which illustrates that each share of Ruby Tuesday stock has an inherent premium of **_approximately 130%_** over the $2.40 Merger

Consideration. Similarly, UBS's *Selected Public Companies Analysis* indicates a per share value range of $2.67 for the Company, which illustrates that each share of Ruby Tuesday stock has an inherent premium of ***approximately 111%*** over the $2.40 Merger Consideration.

72.     In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

73.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

74.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that registration statement communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

75.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement and the use of their name in the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) the

terms and details surrounding any alternative indications of interest the Company solicited or received from other companies; (ii) the financial projections for both Ruby Tuesday; (iii) the financial analyses performed by the Company's financial advisor, UBS, in support of its fairness opinion; and (iv) the actual Merger Consideration.

76.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to Ruby Tuesday shareholders although they could have done so without extraordinary effort.

77.     Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. Indeed, the Proxy Statement states that Defendants were privy to and had knowledge of the financial projections for both companies and the details surrounding discussions with other interested parties and UBS. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review the bankers' analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in

preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

78.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.   The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully.   Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of both companies' financial projections.

79.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the shareholder vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **COUNT II**

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

80.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Ruby Tuesday within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Ruby Tuesday, and participation in and/or awareness of the Ruby Tuesday's

operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Ruby Tuesday, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

82.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Ruby Tuesday, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction.  The Individual Defendants were thus directly involved in the making of the Proxy Statement.

84.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

85.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

86.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

87.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.     Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

C.     Rescinding, to the extent already implemented, the Merger or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.  Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted this the 17th day of November, 2017.

**BRANSTETTER, STRANCH
& JENNINGS, PLLC**

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV, BPR# 23045
Benjamin A. Gastel, BPR# 28699
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@bsjfirm.com
beng@bsjfirm.com

**Ademi & O'Reilly, LLP**
Guri Ademi, WI SBN No. 1021729
(Pro Hac Vice Forthcoming)
Shpetim Ademi, WI SBN No. 1026973
(Pro Hac Vice Forthcoming)
3620 East Layton Ave.
Cudahy, WI 53110
T: (414) 482-8000
F: (414) 482-80012
gademi@ademilaw.com